# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| CURT HEDDING, o/b/o HEDDING SALES & SERVICE, | Civil No. 18-1233 (JRT/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION & ORDER DENYING MOTION TO DISMISS** |
| THE PNEU FAST COMPANY, | |
| Defendant. | |

Daniel P. Brees, **GASKINS, BENNETT & BIRRELL, LLP,** 333 South Seventh Street, Suite 300, Minneapolis, MN 55402, for plaintiff.

Benjamin Kinney, **LAW OFFICES OF THOMAS SHIAH,** 247 Third Avenue South, Minneapolis, MN 55415, and Michael S. Poncin, **MOSS & BARNETT, PA,** 150 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for defendant.

Plaintiff Curt Hedding ("Hedding") brings this action against Defendant The Pneu Fast Company ("Pneu Fast"), alleging a violation of the Minnesota Termination of Sales Representative Act ("MTSRA"). Presently before the Court is Pneu Fast's Motion to Dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). Because Hedding has alleged facts sufficient to show a violation of the MTSRA and has claimed damages in excess of $75,000, the Court will deny the motion.

## BACKGROUND

1

## I. FACTS

Hedding is a Minnesota citizen and the owner of Hedding Sales & Services ("Hedding Sales"), a Minnesota sole proprietorship. (Am. Compl. ("Compl.") ¶¶ 1-2, June 19, 2018, Docket No. 21.) Hedding Sales represents manufacturers in the sale and distribution of goods. (*Id.* ¶ 3.) In 2006, Hedding Sales entered into a Representative Agreement (the "Agreement") with Pneu Fast, an Illinois corporation specializing in the production of nails and staples used in certain power tools. (*Id.* ¶¶ 4-5, 11). The Agreement established that Hedding Sales would represent Pneu Fast in the sale and distribution of its products across nine states, including Minnesota and Ohio. (*Id.* ¶ 11 & Ex. A ("Agreement") at 7.) It was to be effective indefinitely and, according to its terms, would be governed by the laws of the State of Ohio. (*Id.* at 5; Compl. ¶¶ 11, 12.)

In relevant part, the Agreement also contained the following terms: (1) Pneu Fast would pay Hedding Sales a 10% commission for one year on new accounts, and 5% thereafter (Agreement at 8); (2) either party could terminate the Agreement with or without cause (*id.* at 4); (3) in the event of termination, Pneu Fast would not be liable to Hedding Sales for any damages whatsoever (*id.*); and (4) any amendment to the Agreement would not be effective unless in writing signed by both parties, except that product prices, product categories, geographic territory, and the commission schedule could be "amended at any time by giving written notice thereof to [Hedding Sales]," (*id.* at 5).

In 2008, Hedding Sales established a new account for Pneu Fast with Menards, a large home improvement chain. (Compl. ¶ 15). Despite agreeing that Hedding Sales would receive a 10% commission on new accounts for the first year and 5% thereafter, Pneu Fast

2

never paid Hedding Sales more than 4% in commissions on the Menards account. (*Id.* ¶¶ 16-20). Nevertheless, Hedding Sales continued to work on the Menards account through 2018. (*Id.* ¶ 36.) Because of its efforts, the account expanded into new states throughout the U.S., including expansions in 2015 and 2016 into Kansas, Missouri, and Wyoming. (*Id.* ¶¶ 24, 26.)

In March 2018, Pneu Fast's President and COO, Reno Joseph, sent a letter to Hedding Sales (the "Termination Letter") terminating the Agreement. (*Id.* ¶ 36.) The Termination Letter stated that the termination would be effective immediately. (*Id.* ¶ 37.) It also denied Hedding Sales any outstanding commissions until Hedding returned all product samples to Pneu Fast. (*Id.* ¶ 39.) The Termination Letter did not include a statement of reasons for the termination, nor did it give Hedding an opportunity to address any such reasons. (*Id.* ¶ 40.)

Hedding now brings a single claim against Pneu Fast, alleging wrongful termination in violation of the Minnesota Termination of Sales Representatives Act ("MTSRA"), Minn. Stat. § 325E.37 (2018). (Compl. ¶¶ 45-55-.) Pneu Fast seeks to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) and lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). (Mot. to Dismiss, June 4, 2018, Docket No. 23.)

II. **MINNESOTA TERMINATION OF SALES REPRESENTATIVES ACT**

The purpose of the MTSRA "is to afford some protection to sales representatives by limiting the circumstances under which their agreements may be terminated."

3

*Cooperman v. R.G. Barry Corp.*, No. 4-91-663, 1992 WL 699500, at *8 (D. Minn. Jan. 10, 1992). The MTSRA's protections extend to sales representatives who are residents of or maintain their principal place of business in Minnesota or whose sales territory includes all or part of Minnesota. Minn. Stat. § 325E.37, Subd. 6. The MTSRA defines "sales representative" as "a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission." *Id.* at Subd. 1(d).

Under the MTSRA, a manufacturer may terminate a sales agreement upon good cause, provided the manufacturer gives the sales representative (1) notice of its intent to terminate at least 90 days before the expiration of the agreement, and (2) 60 days in which to correct the reasons stated for termination. *Id.* at Subd. 2. If a manufacturer does not have good cause to terminate, it must renew the sales agreement or give written notice of its intent not to renew at least 90 days before the expiration of the agreement. *Id.* at Subd. 3. A sales agreement of indefinite duration is treated as an agreement of definite duration expiring 180 days after written notice of intent to terminate is given. *Id.*

The newest subdivision of the MTSRA, Subdivision 7 (the "Anti-Waiver Provision"), was enacted on August 1, 2014, to prevent manufacturers from using contract terms to circumvent the statute's existing requirements. It provides that sales agreements may not include choice of law provisions for any state other than Minnesota and may not purport to waive any MTSRA requirements. *Id.* at Subd. 7. Any such provisions are automatically void and unenforceable. *Id.* The Anti-Waiver Provision became effective on August 1, 2014, as to "sales representative agreements entered into, renewed or

4

amended on or after that date." Act of April 14, 2014, Ch. 165, S.F. No. 2108, 2014 Minn. Laws.

## DISCUSSION

I. **FAILURE TO STATE A CLAIM**

A. **Standard of Review**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops 'short of the line between possibility and plausibility,'" and therefore must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557).

B. **Conflict-of-Laws Analysis**

If applicable, the MTSRA would directly conflict with several of the stated terms in the parties' Agreement. Likewise, it could render the termination of Hedding Sales unlawful. Pneu Fast argues, however, that the MTSRA does not apply and Hedding's claim should therefore be dismissed. Pneu Fast asserts that a conflict-of-laws analysis requires application of Ohio law, precluding application of the MTSRA entirely. Pneu Fast further asserts that, even putting choice-of-law questions aside, the Anti-Waiver Provision was never triggered because the Agreement was not "amended or renewed" after August 1, 2014. If true, then the parties' Ohio choice-of-law provision would remain in place. Because a conflict-of-laws analysis favoring Ohio law would end the Court's inquiry, the Court will address that issue first.

The Court first notes that a such a finding would allow Pneu Fast to accomplish precisely what that Minnesota Legislature intended to prohibit when it enacted the 2014 Anti-Waiver Provision. That is, it would allow Pneu Fast to circumvent the requirements of the MTSRA by discarding Minnesota law altogether in favor of the laws of another state. Nevertheless, the Court will proceed with its conflict-of-laws analysis.

"A federal court sitting in diversity must apply the choice of law principles of the state in which it sits . . . ." *Florida State Bd. of Admin. v. Law Engineering and Environmental Services Inc.*, 262 F. Supp. 2d 1004, 1010 (D. Minn. 2003). Thus, Minnesota choice-of-law principles control here.

Minnesota courts have traditionally honored parties' contractual choice-of-law provisions. *Milliken and Co. v. Eagle Packaging Co., Inc.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980). However, parties do not have unchecked power to choose their own law,

6

particularly where the State has "expressed an intent to protect its citizens with its own laws by voiding . . . choice-of-law provisions . . . ." *Banbury v. Omnitrition Intern., Inc.*, 533 N.W.2d 876, 880 (Minn. Ct. App. 1995). Recognizing this limitation, the Eighth Circuit has explained that "the law of the state chosen by the parties will be applied unless to do so 'would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . .'" *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 858 F.2d 1339, 1342 (8th Cir. 1988) (quoting the Restatement (Second) of Conflict of Laws § 187(2)(b) (Am. Law. Ins. 1971)).

Such a policy may be evidenced by explicit statutory language. A useful illustration is the Minnesota Franchise Act ("MFA"). In 1994, the Minnesota Legislature passed an amendment to the MFA, which reads:

> Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state . . . or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn. Stat. § 80C.21 (2018). In *Banbury*, the Minnesota Court of Appeals found that the amendment's language expressed the legislature's intent to prohibit circumvention of the MFA's terms through choice-of-law provisions. 533 N.W.2d at 880. The court therefore held that the parties' Texas choice-of-law provision was void. *Id.* A court in this district came to the same conclusion in a similar case and voided a choice-of-law provision

7

accordingly. *Delaria v. KFC Corp.*, Civ. No. 4-94-116, 1995 WL 17079305, at *6 (D. Minn. Jan. 13, 1995).

The Eighth Circuit has likewise emphasized statutory clarity in resolving tensions between a state's expressed policy priorities and parties' choice-of-law provisions. In *JRT, Inc. v. TCBY Systems, Inc.*, the court stated that "anti-waiver statutes . . . will void choice of law contract clauses only so long as it is clear the state legislature deliberately targeted choice of law provisions." 52 F.3d 734, 739 (8th Cir. 1995). To apply to agreements signed prior to their effective date, anti-waiver provisions must also define their scope as such. *See TCBY Systems, Inc. v. RSP Co., Inc.*, 33 F.3d 925, 930 (8th Cir. 1994) (finding that, although the MFA's anti-waiver provision applied to choice-of-law clauses, it did not apply to agreements signed before its effective date and thus did not void the parties' choice-of-law provision).

Like the 1994 amendment to the MFA, the MTSRA's Anti-Waiver Provision unambiguously expresses the Minnesota Legislature's intent to prioritize the statute's protections over parties' choice-of-law. It also defines the scope of its application, extending only to agreements enacted, amended or renewed after August 1, 2014. Accordingly, the Court finds that Minnesota has a clearly-defined policy of protecting its sales representatives from agreements purporting to waive the protections of the MTSRA by any means. This policy precludes the Court from honoring contractual choice-of-law provisions for sales agreements that were enacted, amended, or renewed after August 1, 2014.

## C. Application of the Anti-Waiver Provision

The Court must now consider whether the Agreement falls within the scope of the Anti-Waiver Provision such that the Ohio choice-of-law provision is void. If it does not, the Court may yet be obligated to apply Ohio law. There is no dispute that Curt Hedding is a sales representative as defined by the MTSRA, or that the Agreement was enacted prior to August 2014. Thus, application of the Anti-Waiver Provision turns on whether the Agreement was renewed or amended after August 1, 2014.

Hedding presents three avenues through which the Agreement may have been renewed or amended in the requisite period: (1) an amendment to the terms of the Agreement; (2) an active renewal; and (3) a passive renewal. Hedding first asserts that the Agreement was amended in 2015 and 2016 to reflect an expanding sales territory. Relying on language in the Agreement requiring amendments to be in writing and signed by both parties, Pneu Fast contends that any changes in the geographic scope of the sales territory were not effective "amendments" that would trigger application of the Anti-Waiver Provision. However, Pneu Fast ignores additional language allowing for exceptions to the writing requirement: ". . . current prices of the Products, and Exhibits A through C may be amended from time to time and at any time by giving written notice thereof to Representative and any such change shall become effective on the date specified in such notice." (Agreement at 5.) "Exhibits A through C" include the geographic sales territory covered by the Agreement. Taking as true Hedding's allegation that the sales territory was expanded in 2015 and 2016, the Court finds it plausible that the changes reflect an "amendment" to the Agreement.

With respect to renewal, Hedding argues that when Pneu Fast encouraged Hedding Sales to take the lead on managing Pneu Fast's account at Menards stores in the expanded sales territory, its actions constituted an "active renewal" of the Agreement. Alternatively, Hedding argues such actions constitute a "passive renewal."

Courts have yet to examine the meaning of "renewed" as incorporated into the Anti-Waiver Provision. However, courts **have** interpreted the term as written in the statute generally. When the MTSRA was enacted in 1990, it applied to sales agreements "enacted, amended, or renewed" after that year. Minn. Stat. § 325E.37. In 1991, Congress amended the MTSRA to clarify that "renewed" included agreements of an indefinite period under which, "with the principal's consent or acquiescence, the sales representative solicits orders on or after May 28, 1991." 1991 Minn. Laws, Ch. 190, § 2(a)(2). Soon thereafter, the Minnesota Court of Appeals addressed whether the MTSRA would apply to a sales agreement entered into in 1986 but terminated in 1991 – after the enactment of the MTSRA. *New Creative Enterprises, Inc. v. Dick Hume & Associates, Inc.*, 494 N.W.2d 509, 510-11 (Minn. Ct. App. 1993). The court held that, because the plaintiff had solicited orders for the defendant after the enactment of the requisite date, their agreement was "renewed" within the meaning of the statute as clarified by the 1991 amendment. *Id.* at 511.

In contrast, in *Angostura International v. Melemed*, a court in this district held that the MTSRA did not apply to an indefinite sales contract entered into in the 1970s and terminated in 1997. 25 F. Supp. 2d 1008, 1010 (D. Minn. 1998). The court found that, despite the 1991 definition of "renewed," "[s]uch a broad application of the MSRA's

amended definition . . . works an unconstitutional retroactive amendment on the pre-existing agreement." *Id*.

*Angostura* supports a narrow reading of the definition of "renewed" as incorporated into the MTSRA. However, *Angostura* stands alone in its narrow reading of the term. Moreover, *Angostura* is distinguishable from the present dispute. There, the parties entered into an agreement over a decade before the passage of the MTSRA. Here, the parties had notice not only of the MTSRA's protections, but also of its definition of "renewal" when they entered the Agreement *and* when they decided to continue under it following the passage of the Anti-Waiver Provision. Additionally, while the parties in *Angostura* merely continued to perform their existing obligations, here, the parties incurred new obligations and costs with the expansion of the account. The Court therefore finds the application of "renewal" in *New Creative Enterprises* more in line with the MTSRA's statutory language. As such, because Hedding Sales continued to solicit orders – and even expanded sales to new territories – for Pneu Fast through 2018, the Court concludes that the Agreement was renewed after August 1, 2014, triggering the Anti-Waiver Provision.

Having determined that the parties' Ohio choice-of-law provision is null and void, the Court must consider whether Hedding has alleged facts showing that Pneu Fast's termination of the Agreement violated the MTSRA. According to the pleadings, Pneu Fast lacked good cause for termination, did not notify Hedding Sales in advance of the termination, and withheld commissions upon termination – each an alleged violation of the MTSRA. As such, Hedding's allegations are sufficient to defeat Pneu Fast's Motion to Dismiss pursuant to Rule 12(b)(6).

## II. SUBJECT MATTER JURISDICTION

Pneu Fast also moves to dismiss Hedding's claim for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), arguing that Hedding has failed to plead facts showing the amount in controversy exceeds $75,000 as required by 28 U.S.C. § 1332.

"The district court has subject matter jurisdiction in a diversity case when a fact finder could legally conclude, from the pleadings and proof adduced to the court before trial, that the damages the plaintiff suffered are greater than $75,000." *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002). The sum claimed by a plaintiff in good faith is usually dispositive, unless "it appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount . . . ." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). "The legal certainty standard is met where the 'legal impossibility of recovery [is] so certain as virtually to negative the plaintiff's good faith in asserting the claim.'" *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011) (quoting *JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 638 (4th Cir. 2010)).

Hedding alleges upwards of $200,000 in damages and lost commissions resulting from termination of the Agreement. There is no indication Hedding made these allegations in bad faith or that it is legally impossible that Hedding suffered damages in excess of $75,000. The Court will therefore deny Pneu Fast's Motion to Dismiss pursuant to Rule 12(b)(1).

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss [Docket No. 23] is **DENIED.**

DATED: January 2, 2019                        ____s/John R. Tunheim_____
at Minneapolis, Minnesota.                 JOHN R. TUNHEIM
                                                               Chief Judge
                                                 United States District Court